**NORTHERN DISTRICT OF NEW YORK**
**UNITED STATES DISTRICT COURT**
_____

**BROOKSTONE COMPANY, INC:, CLAIRE'S BOUTIQUES
INC., COUNTY SEAT STORES, INC.; NATIONAL RECORD
MART, INC., OLYMPIA SPORTS CENTER, INC., AMERICAN
EAGLE OUTFITTERS, INC., EDDIE BAUER, INC.,
GYMBOREE CORPORATION, GYMBOREE RETAIL STORES,
INC. (d/b/a GYMBOREE), HICKORY FARMS, INC., NATURAL
WONDERS, INC., PACIFIC SUNWEAR OF CALIFORNIA,
INC., PACIFIC SUNWEAR STORES CORP., REGIS
CORPORATION, RETAIL VENTURES INCORPORATED (d/b/a
AMERICAN EAGLE OUTFITTERS), MORRISON
INCORPORATED (d/b/a RUBY TUESDAY), SELECT
COMFORT DISTRIBUTION CORPORATION, EDUCATIONAL
MODULES, INC. (d/b/a WORLD OF SCIENCE) and WORLD OF
SCIENCE, INC.,**

**Plaintiffs,**

–v–

5:96-CV-1215
(NAM/GHL)

**PYRAMID COMPANY OF HADLEY, PYRAMID COMPANY OF
HOLYOKE, INDEPENDENCE MALL GROUP, SILVER CITY
GALLERIA GROUP, PYRAMID COMPANY OF GLENS FALLS,
PYRAMID COMPANIES OF ONONDAGA, PYRAMID
CHAMPLAIN COMPANY, PYRAMID CROSSGATES
COMPANY, PCM DEVELOPMENT COMPANY, PCK
DEVELOPMENT COMPANY, POUGHKEEPSIE GALLERIA
COMPANY, PYRAMID COMPANY OF ITHACA, PYRAMID
COMPANY OF PLATTSBURGH, PYRAMID COMPANY OF
WATERTOWN, SENPIKE MALL COMPANY, PYRAMID
COMPANY OF BUFFALO, BERKSHIRE MALL GROUP,
PYRAMID MANAGEMENT GROUP, INC., RICHARD K.
ASKINS, DARIUS BAXTER, JOHN A. BERSANI, ROBERT A.
BREVNIK, KEITH CANNON, WILLIAM L. CAPALLETTI,
JOHN C. CHARTERS, ROBERT J. CONGEL, MARK J.
CONGEL, W. GARY CRAIG, JERALD M. DICK, GARY L.
DOWER, MICHAEL J. FALCONE, LESLIE G. GRANGER,
DONALD W. HOLLINGS, KEVIN L. KANE, EDWARD A.
KELLOGG, THOMAS R. KENNEDY, BRUCE A. KEENAN,
ANTHONY C. LAVALLE, LEONARD LEVEEN, J. DANIEL
LUGOSCH III, MARC A. MALFITANO, PATRICK A.X.**

1

**MANION, FRANCIS J. MCINERNY, DONALD F. MOORE,
DAVID J. NETTINA, TODD R. NORLEY, JOEL D. RIFKIN,
ROBERT V. RIFKIN, RENEE ST. PIERRE, BRIAN T. SCIERA,
RICHARD SCHULIAR, JOSEPH T. SCUDERI, MICHAEL P.
SHANLEY, C. DANIEL SHULMAN, PETER C. STEINGRABER,
JOSEPH STOCKWELL, WESLEY TANNER, WILLIAM R.
TAPELLA, DONNA TARBANIA, JAMES A. TUOZZOLO,
ROBERT L. UNGERER, THOMAS J. VALENTI, ANDREW
VONDEAK, JERALD M. DICK FAMILY TRUST, ROBERT V.
HUNTER as Trustee of ROBERT J. CONGEL LIVING TRUST,
ROBERT V. HUNTER as Trustee of BRUCE A. KEENAN LIVING
TRUST, ROBERT V. HUNTER as Trustee of WESLEY F.
TANNER LIVING TRUST, ROBERT V. HUNTER and THRITEE
D. BAXTER as Trustees of BAXTER FAMILY TRUST, MICHAEL
FALCONE TRUSTS #1 through #4, ELDAMAR ASSOCIATES,
JDL ASSOCIATES, JOLAINE ASSOCIATES, MOSELLE
ASSOCIATES, RIESLING ASSOCIATES, QUARRY
ASSOCIATES and WOODCHUCK HILL ASSOCIATES,**

**Defendants.**

---

APPEARANCES:                          OF COUNSEL:

Pryor, Cashman, Sherman & Flynn        Joseph Z. Epstein, Esq.
410 Park Avenue                        Kathryn E. Wagner, Esq.
New York, New York 10022
and
Greene, Hershdorfer & Sharpe           Victor J. Hershdorfer, Esq.
One Lincoln Center, Suite 330
Syracuse, New York 13202
Attorneys for Plaintiffs

Boies, Schiller & Flexner LLP          Michael I. Endler, Esq.
10 North Pearl Street
Albany, New York 12207
Attorneys for Defendants John A. Bersani,
John C. Charters, Edward A. Kellogg,
J. Daniel Lugosch, III, Peter C. Steingraber
and Robert L. Ungerer

Williams & Connolly LLP                Kenneth C. Smurzynski, Esq.
725 12th Street, N.W.                   Michael K. Stern, Esq.
Washington, D.C. 20005
and

2

Sonneborn, Spring, O'Sullivan & Zenzel, P.C.          James L. Sonneborn, Esq.
The Seneca Building
241 West Fayette Street
Syracuse, New York 13202
Attorneys for Pyramid Defendants

**Hon. Norman A. Mordue, D.J.:**

## MEMORANDUM-DECISION AND ORDER

## I.     INTRODUCTION

This case involves claims by a group of national retailers ("plaintiffs"), who rent space in shopping centers owned by defendant partnerships and managed by defendant Pyramid Management Group, Inc. (collectively, "defendants"), against defendants to recover alleged overcharges of rent.  In March of 2004 the case was referred to Magistrate Judge George H. Lowe ("Judge Lowe") to oversee the discovery process.  Judge Lowe has conducted regular status conferences to monitor the discovery and deposition progress.  On November 17, 2004, Judge Lowe ruled that attorney-client privilege did not apply to any communications between plaintiffs and their lease auditing consultants as well as to any communications between  plaintiffs' attorneys and plaintiffs' consultants.  During the course of the conference, Judge Lowe also imposed certain limitations on the scope of discovery.  Presently before the Court are plaintiffs' objections to Judge Lowe's November 17, 2004 rulings.  For the reasons set forth below, the Court finds plaintiffs' objections to be without merit and, accordingly, affirms Judge Lowe's rulings of November 17, 2004.

## II.    FACTUAL BACKGROUND

### A.     Judge Lowe's Ruling on the Scope of Attorney-Client Privilege

In 1994 plaintiffs engaged Ross Consulting Group, Inc. (""RCG"), a contingent-fee lease

auditing firm, to research and analyze plaintiffs' lease occupancy costs and to determine whether plaintiffs had been overcharged for rent of commercial space.[1]  In exchange, RCG would receive fifty percent of the first $500,000, and forty percent thereafter, of all claims and/or savings that may result from the work performed by RCG on behalf of plaintiffs.

On October 14, 2004, defendants took the deposition of plaintiff American Eagle Outfitters.  The witness refused to discuss the services that RCG performed for plaintiff, claiming that such information was privileged.  Defendants argued that withholding of such information was improper because it pertained to a time period when no retainer agreement had yet existed between Pryor Cashman and plaintiffs.  Plaintiffs, however, maintained that an attorney-client relationship can be formed prior to the execution of a retainer agreement.  The parties subsequently submitted their disagreement for resolution to Judge Lowe.  Judge Lowe heard arguments from both parties and ruled that no privilege could attach prior to the execution of a retainer agreement between the particular plaintiff and Pryor Cashman.  Plaintiffs immediately sought the opportunity to file a formal motion with regard to the privilege issue.  Judge Lowe granted plaintiffs' request.  Accordingly, on October 17, 2004, plaintiffs filed a letter-brief in support of their position.[2]

On October 18, 2004, both parties participated in a conference call with Judge Lowe.   At this point in time, Judge Lowe directed plaintiffs to submit an affidavit setting forth plaintiffs'

---

[1]It should be noted that plaintiffs retained RCG as their lease auditing consultants prior to retaining Pryor Cashman Sherman & Flynn LLP ("Pryor Cashman") as their attorneys.

[2]The parties disagree with respect to what type of issues were raised by plaintiffs in their letter-brief.  Plaintiffs argue that the letter-brief addressed only the issue of whether attorney-client privilege can attach prior to the execution of a formal retainer agreement.  Defendants, however, maintain that the letter-brief also addressed a broader issue of whether the communications involving the non-attorney consultants were within the scope of the attorney-client privilege.

contractual relationship with its consultants.  On October 22, 2004, plaintiffs submitted the requested affidavit.[3]  On October 26, 2004, defendants filed a brief in response to plaintiffs' papers.  In their brief, defendants argued that the attorney-client privilege did not apply to any communications involving consultants, because they were hired to provide lease auditing services rather than services akin to that of an interpreter between plaintiffs and their attorneys, as required by the relevant case law for the privilege to attach.[4]

    Judge Lowe addressed the submissions of both parties in an in-person hearing on October 27, 2004.[5]  Initially, Judge Lowe acknowledged that case law cited by plaintiffs supported their position.  Defendants, however, continued to argue that under a relevant legal precedent, communications involving a non-attorney intermediary can be privileged only if the intermediary functions as an interpreter of information for the benefit of the attorney, and that the consultants here did not play that role.[6]  *See* R.13A, pp. 18-22.  Judge Lowe indicated that he might have to

---

[3]Parties also disagree with respect to what type of issues were addressed by the affidavit in question.  According to defendants, the affidavit was replete with factual and legal contentions addressing the issue of whether communications with non-attorney consultants were privileged.  On the other hand, plaintiffs maintain that the affidavit was submitted as a factual background to assist Judge Lowe in deciding only the issue of whether attorney-client privilege may attach prior to the execution of the formal retainer agreement.

[4]Plaintiffs maintain that defendants' opposition brief improperly expanded the narrow issue of whether attorney-client privilege may attach prior to the execution of the retainer agreement to one that encompassed the existence of any privilege between plaintiffs' counsel and their consultants.

[5]During this conference Judge Lowe ruled that with regard to all plaintiffs except one, an attorney-client relationship came into existence as of the date of the retainer agreement.  Accordingly, Judge Lowe directed plaintiffs to submit the retainer agreements *in camera* to ascertain the relevant dates.

[6]Defendants provided the Court with unofficial transcripts of status conferences that took place on 10/18/2004, 10/27/2004, 11/10/2004, and 11/17/2004.  For convenience purposes, the Court will cite to the transcripts of the status conferences by using the same citation system as utilized by defendants in their opposition papers.

evaluate individually each communication involving consultants to determine whether it was privileged. Defendants responded that on the evidence before Judge Lowe he could rule that no communications involving consultants were protected by the attorney-client privilege. *See id.* at pp. 22-25. The parties then discussed extensively the question of whether the issue would be ripe for determination. *See id.* Judge Lowe concluded the conference by stating that he was going to give some thought to defendants' argument and would address it at a later date. *See id.* at pp. 36-37.

Judge Lowe convened another status conference on November 10, 2004. At this point in time Judge Lowe heard further arguments on the issue of whether he could rule that all communications involving the consultants were not privileged. *See* R.15A, pp.3-5. Subsequently, on November 17, 2004, Judge Lowe ruled that no communications involving consultants were privileged. *See* R.17A, p.4.

**B.**    **Judge Lowe's Imposition of Certain Limits on the Scope of Discovery**

As it pertains to discovery, in document requests 99-110 plaintiffs sought from defendants a variety of documents relating to utility charges billed to plaintiffs and other non-plaintiff tenants. In response to those requests, defendants agreed to produce three categories of documents: (1) energy surveys for the stores at issue in this lawsuit, (2) energy studies for the stores at issue in this lawsuit, and (3) documents that show the amounts and rates each landlord had actually paid to local utility companies.

In an Order dated July 29, 2004, Judge Lowe ordered the parties to file any further submissions on document requests 99-100 no later than August 5, 2005. On that date, plaintiffs submitted a letter-brief requesting production of the following documents: (1) all income entries on the various shopping centers' general ledgers that pertain to utilities (both premises and

common areas), (2) underlying journal entries, (3) the chart of accounts related to the income entries (which provides the specific code numbers assigned to each income account that is recorded on the general ledger and corresponds to particular underlying invoices), (4) Energy Auditors & Consultants, INC ("EAC") energy audits for all tenants in a given shopping center, and (5) budgets.  Defendants submitted a brief in opposition to plaintiffs' document requests.

At the October 27, 2004 status conference Judge Lowe directed defendants to produce the materials identified in the August 5, 2004 letter for a period of three years to be selected by plaintiffs.  On November 4, 2004, defendants requested a clarification of Judge Lowe's order regarding the production of materials responsive to plaintiffs' document request 99-110. Defendants stated that plaintiffs' August 5, 2004 letter included categories of documents that were not discussed during prior status conferences and production of which would be inconsistent with Judge Lowe's prior orders.  Plaintiffs submitted a letter in opposition to defendants' request for clarification.

On November 17, 2004 Judge Lowe clarified his October 27, 2004 order by ruling that defendants had to provide plaintiffs with income general ledger entries only for a three year period and did not have to identify the amount collected for utility charges from each individual tenant. *See* R.17B, p.7.  With respect to the underlying journal entries, Judge Lowe ruled that defendants had to produce those only for a six month period.  *See id.* at p.11.  Judge Lowe also ruled that defendants did not have to produce energy studies for tenants other than plaintiffs.  *See id.* at p.14.

Presently before the Court are plaintiffs' objections to Judge Lowe's November 17, 2004 rulings.

**III.     DISCUSSION**

**A.     Standard of Review**

7

When a party timely appeals a magistrate judge's nondispositive order "[t]he district judge to whom the case is assigned shall consider such objections and shall modify or set aside any portion of the magistrate judge's order found to be clearly erroneous or contrary to law." *Fed. R. Civ. P. 72(a).* The Supreme Court has recognized that "[a] finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *U.S. v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948). A finding, however, is not clearly erroneous when "there are two permissible views of the evidence," and as such should be affirmed as long as "any reasonable view of the record" supports the factfinder's conclusions. *See Banker v. Nighswander, Martin & Mitchell*, 37 F.3d 866, 870 (2d Cir.1994); *Marine Midland Bank, N.A. v. U.S.*, 11 F.3d 1119, 1123 (2d Cir.1993). Pursuant to this highly deferential standard of review, magistrate judges are afforded broad discretion in resolving discovery disputes and reversal is appropriate only if the discretion is abused. *See Conway v. Icahn*, 16 F.3d 504, 510 (2d Cir.1994). The Court will address each of plaintiffs' objections accordingly.

**B.    Judge Lowe's Ruling on the Scope of Attorney-Client Privilege**

Plaintiffs object to Judge Lowe's ruling that attorney-client privilege does not attach to any communications involving consultants. First, plaintiffs argue that this issue was not, from a procedural standpoint, properly before Judge Lowe. Second, plaintiffs maintain that Judge Lowe's conclusion that no privilege attached to any communications in question is contrary to existing law. After carefully reviewing the record, the Court concludes that plaintiffs' arguments are without merit.

**1.    Whether Judge Lowe's Ruling Regarding the Attorney-Client Privilege Was Procedurally Proper?**

Plaintiffs argue that with respect to the issue of attorney-client privilege, Judge Lowe was

asked to determine only if the attorney-client privilege can attach prior to entry into a formal retainer agreement. According to plaintiffs, Judge Lowe's ruling that attorney-client privilege did not attach to any communications between the consultants and plaintiffs and consultants and plaintiffs' attorneys was procedurally improper because: (1) plaintiffs had never raised this particular issue with Judge Lowe; (2) the ruling on the issue was not made in response to a motion, but was based on defendants' buried request made in their opposition papers; and (3) plaintiffs had no opportunity to fully address the issue in question.

Plaintiffs argue that they had never raised the issue of whether the attorney-client privilege attached to any communications involving consultants. According to plaintiffs, the issue was raised for the first time in defendants' brief, dated October 26, 2004 - and then only "buried" in that brief.[7] Plaintiffs' argument is, however, undermined by the papers plaintiffs submitted for consideration to Judge Lowe. Specifically, affidavit submitted by plaintiffs' attorney, dated October 22, 2004, explicitly states that it has been submitted

> in support of the plaintiffs' position (1) that the attorney-client privilege between each plaintiff and my firm attached when, pursuant to my authorization, REMCO and/or Ross Consulting Group ("RCG") first discussed with me and with each plaintiff whether that plaintiff was interested in participating in this lawsuit and (2) that communications between REMCO and/or RCG (collectively "Consultants") and the plaintiffs or my firm regarding claims against the defendants in this action are covered by the attorney-client privilege from that time f o r w a r d .

Furthermore, the affidavit states as follows:

> [U]nder the law as summarized in my October 17, 2004 letter to this Court, communications between or among the attorney, the client and/or such

_____

[7]The Court cannot agree with plaintiffs' assertion that the issue of whether any of the communications with consultants were privileged was "buried" in defendants' opposition brief. Indeed, the first section of defendants' Argument was entitled "The Attorney-Client Privilege Does Not Apply Because Plaintiffs Hired the Contingent-Fee Lease Auditors To Provide Lease Auditing Services."

> professional representative are privileged because they are intended to be
> confidential and are implemented for the purpose of the attorney performing
> services and giving advice for the client's benefit. ... The Consultants - initially
> communicating with me on behalf of the prospective clients and continuing to
> assist my firm in handling this lawsuit - are covered by the attorney-client
> privilege under relevant decisional authority.

In light of these admissions, the Court finds plaintiffs' argument that they had never submitted the issue of whether communications with non-attorney consultants are within the scope of the attorney-client privilege to the Court, without merit.  Furthermore, the Court finds that defendants did not improperly broaden the issue by arguing that none of the communications with the consultants were subject to privilege.  By including this argument in their opposition brief, defendants merely responded to what plaintiffs' attorney set forth in his affidavit.

Plaintiffs also argues that Judge Lowe's ruling on the issue in question was procedurally improper because it was not made in response to a motion.  Plaintiffs' argument presupposes that a motion can be made only in writing.  Fed. R. Civ. P. 7(b)(1), however, expressly contemplates that a motion may be made orally during a hearing.  "The type of 'hearing' at which there is no need for reducing a motion to writing is one in which the proceedings are recorded." *Int'l Bus. Corp. v. Edelstein*, 526 F.2d 37, 47 (2d Cir. 1975) (citing *Alger v. Hayes*, 452 F.2d 841, 843 (8th Cir. 1972).  Furthermore, "[a]s long as an oral motion is made during a proceeding which falls under ... [a] liberal definition of 'hearing,' the trial court cannot refuse to tender it or attempt to exclude it from the record, notwithstanding that the judge may reserve his decision on the motion until a later date." *See id.*

During the October 27, 2004 status conference defendants, plaintiffs, and Judge Lowe extensively discussed whether the issue of whether the attorney-client privilege attached to any communications involving consultants was ripe for consideration.  *See* R.13A, pp.22-31.  At the end of this discussion, defendants expressly asked the court to rule that none of the

communications between the parties in question were subject to attorney-client privilege. *See id.* at p.28. Even though Judge Lowe was initially uncertain about his authority to issue such a ruling, at the end of the conference he made the following statement: "... I am going to, I am still intrigued ... [by the] thought that I'm not buying into yet, but ...[the] thought that somehow I can make a blanket ruling. I am going to think about that." R.13A, p.36. In response, attorney for defendants encouraged Judge Lowe to consider the issue: "I guess what I'm saying is I'd welcome you looking at this issue and I think there's a reason why courts have decided this all one way. And that's because as a practical matter you need to look at the nature of the relationship as opposed to a conversation-by- conversation basis." *Id.* at pp.36-37. Judge Lowe indicated that upon further examination of the issue he may resolve it in defendants' favor: "I assure you I would love in one sense to reach the result you want me to reach. That would save me a lot of time and effort and that's why I'm going to revisit it." *Id.* at p.37.

During the November 10, 2004, status conference defendants once again asked Judge Lowe to rule on the issue of whether any of the communications with the consultants were privileged. *See* R.15A, pp.3-5. At this point in time, Judge Lowe stated that he was leaning to resolve the issue against defendants - i.e., deny them the blanket ruling that no privilege attached to any communications with consultants and instead, as urged by plaintiffs, decide the issue of attorney-client privilege on communication-by-communication basis. *See id.* at p.5. Judge Lowe, however, reserved his ruling until the later date. *See id.*

As is evident from the discussions that took place during status conferences held on October 27, 2004 and November 10, 2004, defendants made an oral motion to Judge Lowe for specific relief and Judge Lowe twice reserved his ruling on the issue in question. The fact that the motion was not submitted in written form does not make the eventual ruling on the motion

11

procedurally improper, as rule Fed.R.Civ.P. 7(b)(1) permits the making of an oral motion during the recorded hearing.[8]

Plaintiffs next argue that they had no opportunity to respond to defendants' argument that communications with non-attorney consultants are not within the scope of the attorney-client privilege. Specifically, plaintiffs maintain that they "were not given an opportunity to meaningfully respond, considering that the Magistrate Judge stated on the record at the October 27 conference that he was inclined not to consider the blanket ruling." The transcript of the October 27, 2004 conference, however, indicates otherwise. At the end of the conference, Judge Lowe explicitly stated that he would further consider the issue in question and would revisit it at a later date. *See* R. 13A, p.37.

Plaintiffs also argue that "[i]n no fashion did the Magistrate Judge suggest that plaintiffs' counsel respond" to defendants' argument that none of the communications between plaintiffs and consultants as well as consultants and plaintiffs' attorneys were privileged. This argument, however, does not help plaintiffs' position. The Court is unaware of any authority suggesting that a Magistrate Judge has an obligation to tell the counsel how to proceed in a particular case. If plaintiffs' attorney desired to submit a written response to defendants' brief, he should have asked Judge Lowe for an opportunity to do so, instead of waiting for Judge Lowe to extend him an invitation to respond.

Furthermore, after carefully reviewing the record the Court finds that plaintiffs had multiple opportunities to respond to the issue of whether any communications involving consultants were privileged. As discussed above, plaintiffs' attorney was first to introduce the issue in question to the court by raising it in his affidavit, dated October 22, 2004. The issue was

---

[8]In the present case all proceedings were tape-recorded.

then extensively discussed during October 27, 2004 status conference and November 10, 2004 status conference. Plaintiff never objected to Judge Lowe's considering the issue of whether, in the present case, communications with non-attorney consultants are within the scope of the attorney-client privilege.[9] In fact, the record indicates that, until now, plaintiff never argued that Judge Lowe had no authority to consider the issue in question. Since plaintiffs had multiple opportunities to address the issue under discussion but failed to do so, they may not now object to Judge Lowe's ruling on the basis that they had no opportunity to respond.

Accordingly, for the reasons set forth above, this Court concludes that Judge Lowe's ruling regarding attorney-client privilege complied with Federal Rules of Civil Procedure and was procedurally proper.

### 2.    Whether Judge Lowe's Ruling Regarding Attorney-Client Privilege Was Contrary to Law?

Plaintiffs maintain that Judge Lowe erred in finding that consultants' communications with plaintiffs and plaintiffs' attorneys were not within the scope of the attorney-client privilege. Specifically, plaintiffs argue that under existing case law, the court may not issue a blanket ruling with respect to issues of attorney-client privilege and must instead determine the applicability of such privilege on a plaintiff-by-plaintiff, question-by-question, or document-by-document basis.

---

[9]In their motion papers plaintiffs argue that they consistently objected to Judge Lowe's considering the issue of whether any of the communications with consultants are covered by the attorney-client privilege. In support of their position, plaintiffs provided this Court with three citations to the transcript of October 27, 2004 status conference. After carefully reviewing these particular citations, as well as transcripts of October 27, 2004 and November 10, 2004 status conferences, the Court concludes that plaintiffs never objected to Judge Lowe's authority to consider the issue in question. At most, plaintiffs argued that the issue of whether the attorney-client privilege attached to communications with consultants should be resolved on communication-by-communication basis rather than through a blanket ruling as requested by defendants. By making this argument, however, plaintiffs implicitly acknowledged Judge Lowe's authority to resolve the issue in question. Accordingly, plaintiffs should not be permitted to object to Judge Lowe's ruling merely because he decided the issue against them.

As fully explained bellow, the Court disagrees with plaintiffs' position.

In the present case, plaintiffs as parties claiming the benefit of the attorney-client privilege have the burden of establishing all the essential elements thereof.  *See von Bulow by Auersperg v. von Bulow*, 811 F.2d 136, 144 (2d Cir. 1987).  The privilege attaches "(1) where legal advice of any kind is sought (2) from a professional legal advisor or in his capacity as such, (3) the communications relating to that purpose , (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal advisor, (8) except the protection be waived.  *See U.S. v. Bein*, 728 F.2d 107, 112 (2d Cir. 1984).

Although no privilege attaches specifically to third-party/client communications, such communications may nevertheless fall within the scope of attorney-client privilege if they meet the traditional requirements of the attorney-client privilege.  *See Summit Ltd. v. Levy*, 111 F.R.D. 40, 41 (S.D.N.Y. 1986).  The application of the attorney-client privilege to communications with a third party depends upon whether such third party is acting as means of translating professional data in his/her field for the attorney or is merely acting in his/her professional capacity on behalf of the client.  As this Circuit has explained:

> What is vital to the privilege is that the communication be made *in confidence* for the purpose of obtaining *legal* advice *from the lawyer*.  If what is sought is not legal advice but only [a third-party's professional] service ..., or if the advice sought is the [third party's] rather than the lawyer's no privilege exists.  *See U.S. v. Kovel*, 296 F.2d 918, 922 (2d Cir. 1961).

Accordingly, in order for plaintiffs' and plaintiffs' lawyers' communications with consultants to be within the scope of attorney-client privilege, plaintiffs must demonstrate that the consultants acted as translators or interpreters of auditing data for the attorneys.  At the November 17, 2004 status conference, Judge Lowe concluded that plaintiffs failed to meet this burden.

The record before this Court amply supports Judge Lowe's conclusion.  The Letter of

14

Agreement between County Seat Stores, Inc. - a former plaintiff in the lawsuit - and defendants

sets forth services consultants were to perform on behalf of plaintiffs.[10]  According to the Letter of

Agreement, consultants were retained by plaintiff to perform the following functions:

> (1) Review plaintiff's store cost and location data;
>
> (2) Perform each type audit service available including, but not limited to, desk audits, field (or landlord audits), store utilities, mall utilities (mall electricity and/or mall HVAC components of CAM), and measuring store and/or shopping centers;
>
> (3) Analyze plaintiff's leases, landlord invoices, public utility invoices, store plans, and related files for selected stores and review findings with retailer's staff for joint decisions regarding potential claims;
>
> (4) Perform selected auditing procedures in the field (i.e., at the landlords' mall offices, shopping center offices, etc. when the right to audit exists;
>
> (5) Prepare and type actual claim letters for plaintiff's review and distribution to plaintiff's landlords;

_____

[10]Plaintiffs objects to Judge Lowe's using Letter Agreement and Bankruptcy Application to support his ruling with respect to attorney-client privilege.  Plaintiffs object to the use of these documents because they set forth the relationship only between the consultants and County Seat Stores, Inc. - an entity that is no longer a party to this suit.  With respect to this objection, the Court notes that County Seat Stores, Inc. had been terminated from the suit as early as March 3, 2004.  Thus, County Seat Stores, Inc. has been terminated from the suit long before the defendants' submitted an opposition brief to which the above mentioned documents were attached or long before Judge Lowe issued his November 17, 2004 ruling.  If plaintiffs had issues with Judge Lowe's reliance on the documents in question, they should have timely voiced their objections to that effect to Judge Lowe.  Since plaintiffs had failed to timely object to the conduct they complain of now, the Court views such objections waived.

Furthermore, since the Letter Agreement between County Seat, Inc. and the consultants seems to be boilerplate, it was reasonable for Judge Lowe to infer that consultants entered into identical agreements with other plaintiffs.  If this was not the case, plaintiff should have informed Judge Lowe of such.  Accordingly, this Court finds neither procedural or legal impropriety in Judge Lowe's relying on the documents submitted to him by defendants in support of their argument and not objected to by plaintiffs.

(6) Present findings in a Management Report including recommendations on
plaintiff's systems and procedures and communicate information on trade practices
and customs to improve business.

The Court agrees with defendants in that none of the services outlined above can be characterized as translation or interpretation of communication between plaintiffs and plaintiffs' attorneys. To the contrary, the evidence on record suggests that plaintiffs hired consultants to provide lease auditing services rather than to provide advice to plaintiffs' counsel. This conclusion is further strengthened by the fact that plaintiffs retained services of consultants two years prior to retaining services of the attorneys. *See* 1 Paul R. Rice, *Attorney-Client Privilege in the United States* §3:5, at 31-32 (2d ed. 1999) ("If the client retains the agent prior to communicating with the attorney, the logical and natural assumption is that the client's communications with the agent were primarily for the purposes of obtaining technical assistance - his advice (for example, an accountant on a tax matter) - rather than the legal advice of the attorney who the client subsequently consulted.").

Furthermore, it cannot be said that the consultants began to function as translators after plaintiffs retained attorneys. The Chapter 11 Trustee's Application for RCG states that RCG was to provide County Seat Stores, Inc. services that were identical to those provided prior to County Seat's retention of Pryor Cashman. As concluded above, those services constitute lease auditing services rather than "translating" of auditing data services that may fall within the scope of attorney-client privilege.[11]

---

[11]It is important to note that plaintiffs rather than defendants bear the burden of establishing that communications in question are covered by the client-attorney privilege. Plaintiffs, however, failed to submit any evidence indicating that consultants in the present case acted as interpreters of auditing data for the benefit of plaintiffs' attorneys. Plaintiffs argue that Judge Lowe did not take into account certain factual information when making his ruling with respect to attorney-client privilege. Specifically, plaintiffs highlight Judge Lowe's failure to consider testimony of plaintiffs' witnesses who "clearly express the view that they believed the

Plaintiffs also argue that under existing case law, the court may not issue a blanket ruling with respect to issues of attorney-client privilege and must instead determine the applicability of such privilege on a plaintiff-by-plaintiff, question-by-question, or document-by-document basis.[12] By making this argument plaintiffs fail to realize that in order to determine whether plaintiffs' or plaintiffs' attorneys' communications with third-parties are covered by the attorney-client privilege the court must engage into a two-step inquiry. First, the court must determine whether the third-party is acting as a "translator" on behalf of the attorney. In order to make this determination the court must focus on the nature of the relationship between the third-party and the attorney. Second, if the requisite relationship exists between the parties in question, the court will have to determine whether any of the communications between them are privileged. This determination is likely to be made on a communication-by-communication basis.

Accordingly, a blanket ruling is appropriate where the court finds that a third-party is not acting in a "translating capacity" for the attorney. If this is the case, there is no need to engage in question-by-question, document-by-document analysis, because regardless of what kind of information is contained within those communications it will not be within the scope of attorney-

---

consultants were working as litigation consultants' for the plaintiffs' counsel in this law suit." This Court, however, finds plaintiffs' argument without merit because plaintiffs had never submitted the testimony in question to Judge Lowe for consideration. Plaintiffs attempt to justify this oversight on their part by arguing that Judge Lowe never asked plaintiffs to submit any factual information that would help him to decide whether communications with consultants were within the scope of attorney-client privilege. This argument, however, does not help plaintiffs' position. As noted above, the Magistrate Judge has no obligation to advise the parties what kind of proof they should submit in support of their respective arguments. In the present case, plaintiffs were on notice that Judge Lowe was considering the issue in question. Accordingly, they should have submitted all the proof they deemed relevant for its resolution.

[12]Plaintiffs do not, however, direct the Court to any case standing for that proposition. In support of their argument, plaintiffs merely cite the cases in which courts determined the application of the attorney-client privilege to one specific communication or document.

17

client privilege. This is so because the existence of relationship between the attorney and the third-party in which third-party acts as a "translator" of information for the attorney is a prerequisite for establishing that communications with the third-party fall within the scope of attorney-client privilege.

In the present case, Judge Lowe concluded that the requisite relationship did not exist between the consultants and the attorneys. Accordingly, Judge Lowe did not err in issuing a blanket ruling on this basis with respect to the attorney-client privilege issue.

### 3. Whether Judge Lowe Erred in Limiting Plaintiffs' Discovery?

#### a. Income General Ledgers

Plaintiffs argue that Judge Lowe erred (1) in limiting initial production of the income general ledger information to three years, and (2) in ruling that defendants need not produce income general ledgers that identify specific tenants.

In their August 5, 2004 letter to Judge Lowe, plaintiffs gave the following reasons for requesting production of income general ledgers:

> Judge Pooler in substance indicated that [defendants] should easily be able to verify whether the energy charges are inflated by determining the aggregate charges it pays to a given utility company for a given shopping center (i.e., premises utilities plus common area utilities) and by comparing that number with the aggregate charges it bills to all tenants in that shopping center (i.e., premises utilities plus common area utilities). Thus, by the documents we are requesting, we seek to verify Dr. Nour's conclusion by the very straight forward method explicitly suggested by Judge Pooler.

> To explain, the income entries in a general ledger, along with the corresponding journal entries and account codes, will enable us to make basic mathematic calculations in accordance with the above. We will be able to calculate the total amounts collected from all tenants at each shopping center for premises utilities (minus the landlord administrative fee) and common area utilities. Because we have received documents showing the charges for electricity billed by local utilities to [defendants], the difference between these two figures will demonstrate the gap between the tenants pay to [defendants] and what [defendants] pay to their utility company for the allegedly same charge.

18

In response to this request, defendants offered to produce general ledgers providing daily totals of cash receipts relating to energy from all tenants, but refused to produce tenant-by-tenant information (i.e., how much was collected from each individual tenant) on the basis that such information was not needed to undertake calculations suggested by Judge Pooler. During the October 27, 2004 status conference Judge Lowe inquired why plaintiffs were seeking tenant-by-tenant information. *See* R.17B, pp.5-6. In response, plaintiffs mainly argued that such information was necessary to demonstrate what the overcharge for each individual tenant was. *See id.* at pp.6-7. Plaintiffs, however, could not explain why the information offered by defendants would not be sufficient to undertake calculations suggested by Judge Pooler. As a result, Judge Lowe ruled that in their general ledgers defendants did not have to identify the amount collected for utility charges for each individual tenant. *See id.* at p.7.

Since plaintiffs consistently maintained that they would prove that defendants had over-billed them for energy be comparing defendants' aggregate collections for utilities to defendants' aggregate payments to local utilities companies, this Court cannot conclude that Judge Lowe abused his discretion in ruling that, at that point in time, defendants did not have to produce tenant-specific income general ledgers. The Court notes that Judge Lowe did not preclude plaintiffs from requesting tenant-by-tenant information at a later date in the event that plaintiffs are able to demonstrate that as a group they have actually been overcharged by defendants for energy costs.

Plaintiffs also object to Judge Lowe's limiting initial production of the income general ledgers information to three years. Judge Lowe justified this limitation by stating that production of the requested documents for a sample of three years would prove or disprove plaintiffs' assertion that defendants overcharged tenants by 75 to 100 percent. In the present case plaintiffs

19

constantly maintained that defendants engaged in a "pattern" of systematically overcharging tenants for energy costs.  Given plaintiffs' allegations of systematic overcharges, this Court concludes that Judge Lowe's ruling does not constitute clear error or abuse of discretion.  This conclusion seems to be particularly appropriate considering that Judge Lowe gave plaintiffs the opportunity to seek income statements from additional years: "And then after that documentation for a three-years period has been produced, and after the plaintiffs have reviewed that data, they can come back to me and request that I direct that the data for other years be produced."  R.13B, p.9.

        **b.**      **Journal Entries**

During November 17, 2004 status conference Judge Lowe noted that given the fraud claim and the false documents uncovered in the related lawsuit involving defendants, plaintiffs were entitled to verify the accuracy of the data reflected on the income side of the general ledgers.[13]  *See* R.17B, pp.9-10.  Plaintiffs object to Judge Lowe's limiting the discovery of journal entries to six months because with such limitation in place, "plaintiffs cannot even test the limited general ledgers since there is no specific tenant information to which to tie the particular journal entries." Plaintiffs, however, submitted no evidence explaining why tenant-specific information is necessary for testing accuracy of general ledgers.  If plaintiffs are to prove their case under Judge Pooler's theory, they merely have to verify that daily totals of cash receipts recorded in general income ledgers correspond with totals of cash receipts recorded in journal entries.  As the Court understands it, in order to determine the totals of cash receipts in journal entries, there is no need to know the identity of the tenants from whom such cash receipts are collected.  The totals of cash

---

[13]Plaintiffs can accomplish this by comparing such data against the corresponding journal entries which reveal amounts paid by each individual tenant for energy charges.

receipts in journal entries can be determined by merely summing up cash receipts received from individual unidentified tenants. If the totals entered in journal entries do not correspond with the totals entered in general income ledgers, such discrepancy would indicate that general income ledgers contain inaccurate information and further discovery would be warranted. Accordingly, the Court finds that Judge Lowe's ruling with respect to journal entries does not constitute abuse of discretion of clear error of law.

**c.    Energy Studies**

Plaintiffs argue that Judge Lowe erred in ruling on November 17, 2004 that the energy studies for tenants other than plaintiff did not have to be produced. Plaintiffs explain their need for energy studies with respect to all tenants in the following way:

> [T]he information to be derived from the EAC energy audits for all tenants in a given shopping center and for common areas again will enable us to calculate with specificity exactly what Pyramid charges each tenant for utilities. Comparable to Judge Pooler's methodology, the sum total of these calculations, when compared to shopping center's actual utilities bills, will demonstrate the difference between utility charges incurred by Pyramid and charges to all tenants for the same utilities.

Defendants in turn resist production of the documents in question by arguing that

> EAC studies would not provide any information that could advance [p]laintiff's theory. The EAC studies estimate the energy consumption and demand, in kilowatt-hours and kilowatts, respectively, for each tenant's premises. They do not determine the cost of that consumption and demand. The rates charged by tenants for each unit of consumption and demand are determined by each lease and can vary significantly among tenants. Moreover, even if an EAC study exists for a given lease, if a checkmeter has been employed, pursuant to the lease, the tenant may be billed for utilities pursuant to the results of the checkmeter. Thus, unlike the income general ledger entries, the EAC studies will not enable [p]laintiffs to add up Pyramid's receipts from tenants for energy and compare them to Pyramid's payments to local utility companies.

Plaintiffs responded to defendants' position by stating that "the energy audits are used by [defendants] as the vehicle to bill the tenants monthly for electricity and specifically reflect what

the tenants' demand is and what the tenants' consumption is." Plaintiffs, however, failed to submit any evidence that would permit this Court to conclude that plaintiffs are correct in their assessment of what type of information can be deduced from the energy studies in question. Since plaintiffs failed to meet their burden of proof with respect to energy studies, the Court affirms Judge Lowe's ruling on this issue.[14]

## IV.  CONCLUSION

Based on the foregoing, the Court finds that plaintiffs' objections to Judge Lowe's November 17, 2004, oral rulings lack merit. Accordingly, it is hereby

ORDERED that the November 17, 2004, oral rulings of Magistrate Judge Lowe are AFFIRMED, and plaintiffs' appeal to Judge Lowe's rulings of November 17, 2004 is DISMISSED as without merit.

IT IS SO ORDERED.

Dated: July 22, 2005
      Syracuse, New York

Norman A. Mordue
U.S. District Judge

---

[14]Furthermore, this Court agrees with Judge Lowe's conclusion that requiring defendants to produce energy studies for tenants other than plaintiffs would be unduly burdensome. To substantiate their claim of burdensomeness, defendants submitted an affidavit of Ms. Horstmyer. The affidavit states that it would be time consuming to determine with exactitude even how many EAC studies exist as they are not separately maintained, but are instead kept in tenant files arranged by lease. In other words, in order to locate and produce an EAC study, defendants would have to look through individual tenant file for that specific lease. According to the affidavit, locating all EAC studies in effect during three selected years will require defendants to examine 1,340 to 1,823 tenant files for each of the three years. Thus, in total defendants would have to review a total of 4,020 to 5,469 tenant files to assemble requested EAC studies.